# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**EDWARD LENGOWICZ, JR. et al.,**

**Plaintiff,**

-vs-                                                    Case No.  5:04-cv-200-GAP-GRJ

**UNITED STATES OF AMERICA et al.,**

**Defendants.**

_____

# MEMORANDUM OPINION

Plaintiffs bring this Federal Tort Claims action for damages based on medical malpractice related to Edward Lengowicz's May 21, 2001, stroke.[1]  A bench trial on the merits of the claim was held on June 26, 2006, through July 5, 2006, and the Plaintiff submitted a post-trial brief (Doc. 91) on August 21, 2006.  This Memorandum Opinion contains the Court's findings of fact and conclusions of law

## I.  Background

Edward Lengowicz ("Lengowicz") and his wife ("Mrs. Lengowicz") have been married since 1973.  (Trial Transcript at 145).[2]  During the early years of their marriage the couple lived in Massachusetts where Lengowicz was in the produce business. (TR at 149).  Eventually, Lengowicz retired from the produce business and in 1981 the couple relocated to Florida.  (TR at 150).  Lengowicz was an active retiree playing golf and softball, boating, and bowling on a regular

_____

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1346.

[2] When citing to the transcript of the trial, the Court will cite to "TR at ___".

basis.  (TR at 151, 324).  In addition, Lengowicz did all of the outside housework including

painting, mowing the lawn, planting flowers and trimming the bushes.  (TR at 151).  Around 1995

Lengowicz took part time work driving a delivery truck.  (TR at 152).  Subsequently, Lengowicz

worked several other part time jobs including: elevator operator and security guard at Florida

Power, bus driver for a Catholic school, and, ultimately, bus driver for Citrus County Transit.  (TR

at 152-53).

Lengowicz has a long history of hypertension and began treatment for his high blood

pressure in the late 1980s at Citrus Primary Care.  (TR at 328).  Throughout his years of treatment

at Citrus Primary Care, Lengowicz had several primary physicians; however, Dr. Christy Davis

("Dr. Davis") was Lengowicz's primary physician from July of 2000 through the period of the

stroke.  (p 60, 91-97).  According to Dr. Davis, when Lengowicz first presented to her in July of

2000 he was taking 60 milligrams of Adalat CC[3] daily, and he reported that his blood pressures

were satisfactory; also, he requested refills on his medication[4].  (TR at 61-62).   During that visit

Dr. Davis' assessment was that Lengowicz's blood pressure was "fairly well controlled."[5]  (TR at

66).

---

[3] There are two classes of blood pressure medication, Calcium Channel Blockers ("CCBs"), and ACE Inhibitors.  Adalat CC is a CCB.  CCBs open up blood vessels in a fairly indiscriminate manner which results in reduction of blood pressure.  (TR at 853).  ACE Inhibitors block an enzyme and the result is a reduction of blood pressure.  (TR at 854).

[4] From 1991 until the time of the stroke, Lengowicz had been on several different combinations of blood pressure medication including Procardia, a CCB; Lotensin, an ACE Inhibitor; Cardizem, a CCB; Callan, a CCB; and Plendil, a CCB.  (TR at 871-81).

[5] Experts for both parties agree that Lengowicz had not been successfully treated with any medication up until Adalat CC.  (TR at 412-13, 861-62, 870-82).  However, there is debate over whether Lengowicz's pressure became controlled on the 60 milligrams of Adalat.

Approximately six months later Lengowicz again presented at Citrus Primary Care at the recommendation of a Department of Transportation ("DOT") examiner who had conducted his yearly physical. (TR at 68, 332-33). The DOT examiner referred Lengowicz to his primary physician because Lengowicz exhibited edema, or swelling, in his feet and ankles at his DOT physical. (TR at 777-78). Dr. Davis examined the edema and concluded that the swelling may have been a result of weight gain, gravity, and prolonged sitting. (TR at 78-79). Dr. Davis did consider the possibility that side effects from Lengowicz's blood pressure medication could be causing the edema, but decided to stay the course with Adalat unless the edema became worse or bothersome. (TR at 78-79).

After this visit, Lengowicz, a veteran, registered at the Veterans' Affairs ("VA") Hospital in Gainesville, FL, at the advice of a friend who informed him that he could purchase his medications at a reduced rate there. (TR at 331-37). Once registered, Lengowicz made an appointment at the VA Clinic in Inverness, FL, ("Inverness Clinic") on April 19, 2001, where he was seen by Advanced Registered Nurse Practitioner Pettaway ("Pettaway"). (TR at 338, 623). Although Lengowicz was instructed, during his registration, to bring his medical records with him to his first visit, he did not present with any records. (TR at 810-11). On Lengowicz's first visit to the Inverness Clinic, his blood pressure was recorded at 142/80. (TR at 631). Also during this visit, Pettaway noted the swelling in Lengowicz's feet and, because she knew that edema was a side effect of calcium channel blockers ("CCBs"), she switched Lengowicz from Adalat CC to Lisinopril, an ACE Inhibitor.[6] (TR at 633-34). Pettaway started Lengowicz on a low dose of ten

---

[6] Pettaway claims that she consulted with Dr. Shah before making this change, but Dr. Shah disputes this. (TR at 765-767; Shah depo. at 44).

milligrams, because titration up to a higher dose is standard procedure with blood pressure medications.  (TR at 636-37).

Lengowicz began to experience elevated blood pressure readings soon after starting on the Lisinopril.  Two weeks later, on May 2, he returned to the Inverness Clinic.  (TR at 342, 671-72). This time, Lengowicz's blood pressure was recorded at 178/100 and he saw a nurse who, after consulting with Pettaway, titrated Lengowicz's dosage up to twenty milligrams and recorded in Lengowicz's chart that the swelling in his feet had improved.  (TR at 671-74).  After this visit, Lengowicz went on a two week vacation during which he continued to experience elevated blood pressure readings.  (TR at 310).  Upon returning from his trip, on May 17, 2001, Lengowicz went back to the Inverness Clinic for a two week follow up appointment.  (TR at 679).  At this visit, Lengowicz's blood pressure was recorded at 156/92 and he saw Pettaway.  (TR at 684).  Pettaway increased Lengowicz's Lisinopril dosage to forty milligrams and started him on a low dose of Lasix, a diuretic.  (TR at 684-86).  Four days later, on May 21, Lengowicz suffered a stroke.[7]  (TR at 208, 344).

On the day of his stroke Lengowicz was transferred from Citrus Memorial to Shands Hospital at the University of Florida ("Shands") in Gainesville, FL.  (TR at 210-20).  Lengowicz stayed at Shands from May 21, 2001, until July 7, 2001, and received extensive, invasive treatment as a result of his stroke.  (TR at 280).  After his treatment at Shands, Lengowicz was transferred to Shands Rehabilitation Facility and stayed there until August 16, 2001.  (TR at 281).  Next, Lengowicz went to Life Care, a nursing home with therapy, as an inpatient.  (TR at  281).  Finally,

---

[7] Although generically referred to as a stroke, in medical terms it was a hypertensive intraparenchymal thalamic hemorrhage.  (TR at 408).

on November 1, 2001, Lengowicz was able to return home; however, he still required professional in-home care as well as physical therapy and rehabilitation sessions.  (TR at 281-82, 286).

Currently, Lengowicz still suffers severe, permanent impairment as a result of his stroke. (TR at 291-301, 532-33).  Lengowicz has suffered from memory loss and an inability to stay focused.  (TR at 299-300, 531).  In addition, both Lengowicz's left side and his peripheral vision are severely impaired; as a result, he cannot put his own shoes on, he cannot bend, he cannot bathe by himself, he cannot dress himself and he has difficulty operating his wheelchair.  (TR at 291-301).

## II. Legal Analysis

Plaintiffs' medical malpractice claim is governed by Florida substantive law and Federal procedural law.  *See Eerie R.R. v. Tompkins,* 304 U.S. 64 (1938).  To prevail in a medical malpractice case in Florida, a plaintiff must establish three elements: (1) the standard of care owed by the defendant, (2) the defendant's breach of the standard of care, and (3) that said breach proximately caused the damages claimed.  *Gooding v. University Hosp. Building, Inc.,* 445 So.2d 1015, 1018 (Fla. 1984).  In this case, the Court concludes that Plaintiffs have failed to meet their burden on the issue of proximate cause and, therefore, will not reach the issues of standard of care or breach.

Florida courts follow the "more likely than not" standard of causation and require proof that the conduct "probably caused the plaintiffs injury."  *Gooding,* 445 So.2d at 1018.  The Florida Supreme Court, in *Gooding,* provides guidance when evaluating a plaintiff's burden, "[Plaintiffs] must introduce evidence which affords a reasonable basis for the conclusion that it is more likely

than not that the conduct of the defendant was a substantial factor in bringing about the result.[8]  A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Id.* (internal citations omitted).

While the expert testimony indicates that Lengowicz's hypertension was a likely cause of the stroke, the Plaintiffs have failed to show that Pettaway's conduct was more likely than not a substantial factor in bringing about the stroke in light of Lengowicz's ten year history of hypertension.

Plaintiffs' contention that the stroke was more likely than not caused by a sustained spike in pressure is not supported by a preponderance of the evidence.  Approximately two weeks after Pettaway changed Lengowicz's blood pressure medications, Lengowicz presented at the Inverness Clinic with concerns about his elevated blood pressure readings.[9]  At that visit, on May 2, 2001, Lengowicz's blood pressure reading was 178/100.[10]  (TR at 672).  Although Lengowicz's May 2, 2001, reading was high, it is normal for an individual to experience elevated readings for a period of time following a change in medication, especially where titration is involved.  (TR at 905-06).

Even assuming that Lengowicz was exhibiting pressures as high as 178/100 on a daily basis since his medication change, this cannot be considered a "sustained period of high pressure"

---

[8] Here, that conduct is defined as Pettaway's decision to change Lengowicz's medication from Adalat to Lisinopril, and her titrated maintenance of that medication until his stroke.

[9] Lengowicz returned to the clinic because Mrs. Lengowicz had been taking home readings of his blood pressures and she became concerned with the elevated readings.

[10] A healthy or "goal" blood pressure is considered 140/90 or less.  (TR at 68, 438).

relative to the ten years of hypertension Lengowicz had experienced prior to these readings.  (TR at 862, 913-17).  In addition, Lengowicz's blood pressure readings throughout his ten year history of hypertension illustrate that Lengowicz's pressures were only intermittently controlled, at best.  (TR at 862).  Plaintiffs claim that Lengowicz was controlled on Adalat CC, however, during the time period that Lengowicz was taking Adalat CC, from December 4, 1996, to April, 19 2001, there are approximately 40 blood pressure readings in evidence, 17 of which contain systolic readings elevated above the goal pressure of 140.[11]  (See, e.g., Pl. Ex. 31).

After Lengowicz's second visit to the Inverness Clinic, he did not return again for approximately three weeks.  During those three weeks, Lengowicz's wife testified that his readings were in the 170-180/100 range.  (TR at 203).  However, when Lengowicz presented for his third and final visit to the VA, he reported to Pettaway that his readings were in the 150-170/80-100 range.[12]  Lengowicz's recorded pressure at that visit was 156/92.  (TR at 682-84, 1005-06, 1010).  Although this is above the goal, it is a significant reduction from the 178/100 reading on May 2.  Defendant's expert, Dominic Sica, M.D. ("Sica"), opines that this reading was an indication that the new medication was working and Lengowicz's blood pressure was on a path to stabilization.  As a result of these readings and expert testimony, the Plaintiffs cannot show that it is more likely

_____

[11] These readings consist of both home readings and doctor's visit readings.

[12] There is some discrepancy between the pressure range Lengowicz reported to Pettaway on May 2, 2001, and the pressure range reported for that same time period in Mrs. Lengowicz's testimony.  In any event, both reported pressure ranges were based upon readings from a home pressure cuff which Mrs. Lengowicz had been using for many years.  It is unknown whether the machine had been calibrated or properly maintained and although the machinery is generally accurate (TR at 1000-01), the accuracy of the Lengowiczs' pressure cuff is somewhat speculative.

than not that a "sustained spike" in pressure attributable to the change in medication was a

substantial contributing cause of the stroke.

The Plaintiffs' own expert witness, Stephen Rosenberg, M.D. ("Rosenberg"), testified that

a patient in Lengowicz's health condition, with an extended history of hypertension, more likely

than not has weakening of the vessels in the brain which increases the risk of hemorrhage. (TR at

443).  In addition, Rosenberg agrees that it is possible that Lengowicz's stroke could have

occurred regardless of Pettaway's conduct.  (TR at 448-49).  Rosenberg's testimony is consistent

with Sica's, who asserts that the hemorrhagic event had a very strong relationship to the lengthy

history of invariably controlled hypertension and very little to do with what was basically a

relatively short period of time when Lengowicz's blood pressure may have been elevated.  (TR at

862).

This expert testimony, combined with the blood pressure readings from Lengowicz's

second and third visits to the Inverness Clinic and the evidence that, while he exhibited some

improvement on Adalat CC before the change in medication, Lengowicz's blood pressure control

was intermittent, results in a conclusion that the Plaintiffs have failed to prove by a preponderance

of the evidence that Lengowicz would not have suffered a stroke but for Pettaway's conduct.

**III. Conclusion**

For the reasons stated herein, it is

**ORDERED** that judgment be entered in favor of the Defendant.  The Clerk is directed to

close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 18, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

-9-